Daniel, J.
In the case of Pryor v. Adams, 1 Call 382, this court held, that it was its duty, in reviewing a decree founded on the verdict of a jury, rendered on an issue out of chancery, to look to the state of the proofs existing at the time when the issue was ordered; and, if satisfied that the chancellor had improperly exercised his discretion in directing the issue, to render a decree, notwithstanding the verdict, according to the merits, as disclosed by the proofs, on the hearing when the issue was ordered. The rule has been followed in several cases since, and in the recent case of Wise v. Lamb, 9 Gratt. 294, its propriety was fully recognized and vindicated in the opinion of the court delivered by Judge Lee : And the elaborate review there made of the precedents ascertaining the principles that should guide the discretion of a chancellor, in deter *761 mining on the propriety of ordering an issue, precludes the necessity of our entering on such a task here.
Upon the authority of the two cases just mentioned, and those cited in the opinion delivered in the latter, it may be considered as well settled, that in no case ought an issue to be-ordered merely to enable a party to obtain evidence to make out his case; that when the allegations of the bill are positively denied by the answer, and the plaintiff has ' failed to furnish two witnesses, or one witness and strong corroborating circumstances in support of the bill, it is error in the chancellor to order an issue-; that no -issue should be ordered until the plaintiff has shown enough to throw the burden of the proof on the defendant; that until the onus is shifted and the case rendered doubtful by the conflicting evidence of the opposing parties, the defendant cannot be deprived, by an order for an issue, of his right to a decision by the court on the ease as made by the pleadings and proofs.
To apply these -rules to the cases under consideration, is, in the view which I have taken -of the state of the proofs when the issues were ordered, to decide their fate.
Much of the testimony offered in support of the bills is of a character to -forbid its being followed as a guide to judicial action in any case without the strictest scrutiny, consisting as it does mainly of supposed admissions and declarations, deposed to by ignorant and illiterate witnesses, many years after such admissions and declarations are said to have been made. And a portion of it is of a character to be excluded altogether, on the score of in competency.
I cannot perceive '-on what ground declarations of Charles Smith, made -long before the execution of the deed of the 21st April 1831, and before there was any treaty or negotiation in relation to the subject matter conveyed, can be received to impeach the deed, or to *762 affect injuriously, in any manner, the rights of William C. Smith, the grantee. Nor can I see why William C. Smith should be held responsible for any declarations of Charles Smith, made after the deed was executed and recorded, and the whole transaction in relation thereto perfected and ended.
In his answer to the bill in the first of these cases, William C. Smith denies expressly that he was guilty of any fraud in the procurement or execution of the deed, or in obtaining the property thereby conveyed $ and, ia his answer to the bill in the second case, after again explicitly denying all fraud, he avers that he had nothing to do with the drawing and preparing of the deed, and was not present when it was prepared and executed, or when it was placed on record. He further states that he is informed and expects to prove that Glooch. the grantor was much attached to him, and had for many years before his death declared that he intended to give him all his property at his death; that he had determined that his relations, who had neglected him, should have none of it, and that he voluntarily employed a highly respectable gentleman to prepare the deed for him; and that as far as he (the respondent) knew, there was no other consideration moving Glooch to execute the deed but his attachment to and friendship for him (the respondent) for his many acts of friendship rendered said Glooch for a series of years, conducive to his comfort and convenience ; unless he considered that various sums of money lent him, amounting to six or seven hundred dollars, was a consideration in part.
And there is an entire absence of any proof to show that William C. Smith had anything to do with the procuring, executing or recording of the deed. If any improper inducement was held out, or false representation made, or art, device or fraud practiced, by Charles Smith in the procurement or execution of the *763 deed, there is nothing to show that William C. participated in it or had any knowledge of it. No concert, agreement or understanding in relation to the transaction between the two Smiths is established. Charles is no party to the deed, and William C. claims no title through him. It is true, there is proof going to show that Charles advised and aided in the execution of the deed, and William C. is the grantee, and has accepted it and claimed under it.
In this state of facts, anything said or done by Charles Smith during the transaction, and in reference to it, may be properly treated as part of it; and William C- Smith is bound by it. It may be very properly said, that claiming the benefit of the transaction, he must take it as a whole. But there is no relation between the parties which justifies us in holding him bound by any acts or declarations of Charles, which were not strictly parts of the res gesta. Any act done by Charles Smith, before the transaction commenced, or after it was finished, tending to impeach, or cast suspicion on, its fairness, cannot be regarded otherwise than as res inter alios acta. And proof of any declarations made by him of a like tendency, at any time, except pending the transaction, is but hearsay.
Much of the testimony in relation to the declarations of Gooch the grantor, is liable to a like objection. His declarations, made after the execution of the deed, fall within the influence of the well established rule, that no admissions or declarations, in whatever form, of a party to a sale or transfer, made after such sale or transfer, and going to destroy and take away the vested rights of another, can ex post facto work that consequence, or be received as evidence against the vendee or assignee. 5 John. R. 426; Pettit v. Jennings, 2 Rob. R. 681.
Whether his declarations made before the commencement of the transaction were properly received *764 in the first of these suits, I have not thought it necessary to. examine with much particularity, for reasons which will hereafter appear: Though I am strongly inclined to the opinion that they were not. Be this as it may, I think it clear that such declarations are J . , not evidence for the plaintiffs - in the second suit. To receive them as evidence to vacate the deed, and to cas^ property on the heirs and next of kin, would be equivalent to permitting a party to testify in his own behalf.
These rules necessarily exclude from the second case the whole of the depositions of Kalley Tucker, Anderson Tucker and George W. Barker, and a large portion of the several depositions of William E. Tyler, George Turner and Nathaniel White. • The paper B ought also, I think, to be excluded from both cases, being nothing more- than a subsequent written declaration of Gooch, by which he endeavors-to destroy the legal force and effect of his deed; executed some six months before.
Any further designation of the portions of the evidence in behalf of the paupers, which ought, to be treated as incompetent, is, in the view which: I have taken of it, unnecessary. Eor looking upon the testimony in support of their claim as a whole, it appears to me vague, conflicting and inconclusive, and as tending (so far as it points to one result rather than another) to make out a case which could be of n© benefit to them. So far as it goes to establish any purpose on the part of Gooch, inconsistent with the deed, it tends to prove, not that he designed to confer on them a state of absolute freedom, but that he designed to leave them in a qualified condition intermediate between absolute slavery on the one hand and absolute freedom on the other; in which, whilst they might enjoy many of the -rights and privileges of freed men, the relation of master and slave between Smith and *765 them might be left subsisting, so far at least as to shield them from the penalties which would otherwise attach to their residence in the state as free negroes.
Such a purpose is in conflict with the policy of our laws, and this, court has uniformly refused to recognize it, no matter how solemnly expressed, or clearly proved, as conferring any rights or benefits on the slave. Rucker’s adm’r v. Gilbert, 3 Leigh 8; Wynn v. Carrell, 2 Gratt. 227.
In the case last cited it was, however, also declared, that when by will slaves are bequeathed to a legatee to be held by him in such a qualified or intermediate condition, that the whole provision is void, and that the slaves (if there is no other disposition of them in the will,) stand as if the testator had died intestate in respect to them.
It becomes, therefore, important to look further into the state of the proofs in the second suit, and to see whether, as between the parties thereto, there was sufficient testimony to justify the chancellor in ordering an issue.
Throwing out of view the testimony which I have treated as incompetent, there remains proof to be found in the depositions of White and others, that Charles Smith borrowed of Gooch, some years before his death, money at different times, amounting in all probably to five hundred and fifty dollars, and that about the date of the last loan a negro man Reuben was placed by Charles Smith in the possession of Gooch, where he remained for some years, when being taken sick, his place was supplied by another negro man Aaron, who remained in the service of Gooch probably till his death. This testimony was no doubt offered, in connection with certain declarations of Gooch, (to the effect that these negroes were placed with him by Charles Smith, to discharge, by their services, the interest on the money loaned,) for the *766 purpose of falsifying that portion of the answer of William C. Smith to the bill of the paupers, in which he states that he had permitted these slaves to remain ^16 possession of Gooch without compensation; and suggests this act of kindness on his part towards’ Gooch, as one of the motives which probably induced the latter to make the deed in his favor. It is hardly necessar7 to say that this testimony, apart from the excluded declarations, whilst tending to establish the conclusions sought to bo drawn from it, is yet wholly insufficient for the purpose. The fact that Charles Smith borrowed money of Gooch, and placed these slaves in his possession, is not inconsistent with the idea that they may have belonged to William C. and that he had, as an act of friendship, permitted Gooch to enjoy their services without compensation.
There yet also remains in the cause the deposition of Foster Higgins, who states that he was at the house of Gooch, and was called on by him and Charles Smith to witness a will, as they said, the day before they went to Hanover clerk’s office to record the same; that Smith and Gooch said the negroes were to be kept on the land, and that Smith was to act as master for them. And that Gooch, some time after his return from the office, said that he had acknowledged the will that he (the witness) had witnessed.
There is also the deposition of Jesse Barker, who states that William C. Smith employed him to act as master for the slaves, stating that the law required some person to do so; that he (Smith) lived too far off to attend to them; that he did not wish to be pestered with them; and that the slaves were to support themselves by their own labor.
There is also the testimony of George Turner, who states that he met Gooch and Charles Smith, as they were going to Hanover court-house, and that Smith said they were going to record a conveyance' of Gooch’s *767 property, and that he (Smith) was to stand master for the slaves, provided he should be the longest liver: And he also states that Gooch was then very drunk.
Another witness, W. E. Tyler, states that he met Gooch and Smith as they were returning from the court-house; that he thought Gooch had been drinking, but did not think him drunk.
This, together with the fact, which is very fully established, that Gooch was an ignorant and illiterate man, constitutes (with the exception of the testimony excluded) substantially the evidence in behalf of the •plaintiffs in the second cause.
It must be conceded that it does tend to excite the suspicion that all was not fair; that Gooch intended to leave to his negroes his land after his death; and to allow them to live upon it and enjoy the fruits of their own labor, under the supervision of Smith, who should stand as master for .them, so as to prevent their being subjected to the operation of the laws with respect to the residence in the state, of free negroes; that he designed to express and effectuate his intentions by means of a will; and that Smith, whose aid and advice he sought, fraudulently palmed upon him the deed under consideration, by falsely representing and reading it to him as a will expressing his intentions.
But when we come to examine the proofs on the other side: The fact that the deed was regularly acknowledged .by the grantor before the clerk of the county, whose position, in the absence of proof to the contrary, is a guaranty that he was an intelligent and honest man, who would not have taken the acknowledgment, until first satisfied that Gooch was in a condition to understand what he was doing; that Gooch had, the year before, executed a deed containing exactly the same provisions, in the presence of witnesses, who attested it by his request; one of whom states that the grantor told him that the deed *768 was as he wanted it; that after consulting counsel as to whether the slaves, if emancipated, could remain in the state, and being informed by him that they could not, the grantor had declared that the slaves would prefer being servants to any good man, to being sent off to a free country; that he had declared that the plaintiffs should never have any of his property, and frequently said that he intended to give it to the grantee Smith; if any doubts or impressions, unfavorable to the fairness of the transaction, still remain, they ought, I think, to be treated as falling far short of that judicial doubt, as to the preponderance of con-c flicting proofs, which alone could justify a chancellor in calling in the aid of a jury.
Several grounds for reversing the decrees,'taken here by the counsel of Smith, which might otherwise have been well worthy of consideration, have been passed over, in as much as the result of the views already presented is to terminate 'the controversy in his favor.
I see nothing in the-character of the claim or nature of the controversy, in either case, calling for the application of rules in respect to the ordering of the issues different from those prevailing in other chancery causes: And I think that the decree should be reversed and the causes remanded, with instructions to the Circuit court, after taking the proper steps for ascertaining and collecting -in the fund arising from the rents and hires, to decree its payment to Smith’s representatives and heirs or devisees,' according ■ to their respective rights, .and to .dismiss both bills.
Lee and Samuels, Js. concurred in .the opinion of Daniel, J.